IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

NATASHA CLAYBROOK, et al.,         )
                                    )
            Plaintiffs,             )
                                    )
vs.                                 )        CIVIL ACTION NUMBER
                                    )
BRK BRANDS, INC., f/k/a FIRST       )            98-C-1546-W
ALERT, et al.,                      )
                                    )
            Defendants.             )

**MEMORANDUM OPINION APPROVING SETTLEMENT AGREEMENT**

This case is about smoke detectors.

Ionization smoke detectors ("ISDs") use a small quantity of radioactive material to create electrically charged particles (i.e., ions) which generate a constant electric current between two electrodes. When smoke particles enter the ionization chamber, they can disrupt this current by combining with the ions and neutralizing them. ISDs sense the resulting change in electrical current and, by way of a horn, sounds an alarm. Ionization technology is most effective in detecting small smoke particles, which tend to be produced in larger quantities by flaming fires. Flaming fires consume combustible materials rapidly and spread quickly (e.g., paper burning in a wastebasket, grease fire in a kitchen). ISDs are therefore more sensitive in detecting flaming fires.

Photoelectric smoke detectors ("PSDs") operate by shining a beam of light into

a sensor chamber.  When smoke particles enter the chamber, they diffuse the light, causing

the sensor to trigger an alarm.  PSDs are generally more sensitive in detecting large smoke

particles, which tend to be produced in greater amounts by smoldering fires.  This kind of fire

may smolder for hours before bursting into flames.  Smoldering fires may be caused by

cigarettes burning in sofas or beds.  PSDs are more sensitive than ISDs in detecting

smoldering fires.

Detectors which combine ionization and photoelectric technologies provide

optimum protection.  These are known as "dual smoke detectors" ("DSDs").

Plaintiffs contend that Defendants, manufacturers and suppliers of smoke

detectors, unlawfully failed to disclose to class members the distinction between ISDs and

PSDs and the fact that both are required for maximum protection.  After protracted

negotiations, the parties have reached a proposed nationwide class action settlement.  The

issue presented is whether the proposed settlement is fair, reasonable, and adequate.  For the

reasons which follow, the Court concludes that the Settlement Agreement comports with the

legal requirements; and the Court will place its imprimatur on the settlement.

## I. Procedural Background

This case was filed on May 18, 1998, in the Circuit Court of Tuscaloosa

County, Alabama.  Based on the diverse citizenship of the parties, the case was removed to

the Western Division (Tuscaloosa) of the United States District Court of the Northern

District of Alabama and assigned to former Chief Judge Sam Pointer.  In a Scheduling Order

2

entered on December 6, 1999, a discovery deadline of May 15, 2000, was set.  On April 3, 2000, after Judge Pointer had retired from the bench, the case was re-assigned to the undersigned judge.

On May 12, 2000, the Court granted Plaintiffs' motion for leave to file a second amended complaint.  In that complaint, Plaintiffs set forth the state law claims of the earlier complaints; that Defendants knew but failed to disclose to customers the limitations of ISDs and PSDs; that Defendants misrepresented the ability of ISDs and PSDs to detect the full spectrum of smoke generated in residential fires; and that Defendants failed to disclose a deficiency in the horns used on some of their ISDs.  The amended complaint also joins new plaintiffs and asserts claims under the Magnuson Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, which invokes this Court's federal question jurisdiction.

On the same day as the Court granted leave for the filing of the second amended complaint, the parties presented the Court with a proposed class settlement.  After reviewing the papers, the Court preliminarily certified a class for settlement purposes, preliminarily approved the proposed settlement, appointed class counsel, directed that notice be given to the class, and set a date for the fairness hearing.  Two weeks later, the Court approved the forms of notice to be given to the class.

## II.  Notice to the Class

At a cost of approximately $1.0 million dollars, actual notice was given to a substantial majority of the roughly 75 million members of the class.  Estimates show that

3

nearly 99 million households in the United States contain smoke detectors. The notice reached approximately 94.8 million of those households, with an average frequency of 3.8 times. Notices were mailed out to 301,085 warranty customers. National cable television commercials featuring the notice were run on CNN, the Discovery Channel, and A&E. Print advertisements of the notice were run in Parade, TV Guide, Newsweek, and People magazine. The notices were published as Sunday inserts in 348 newspapers throughout the United States, with a circulation of 37.3 million; a news release was distributed to over 2,500 news points. A feature story on the notice was distributed to over 10,000 newspapers. The magazines and newspapers that carried the notice are circulated to an estimated 100.8 million households. A website that includes both forms of the notice has been established on the Internet, http://www.brksmokealarmsettlement.com. As of August 11, 2000, the site had received 148,589 hits; it has an average of 252 visitor hits per day.

### III. Provisions of the Settlement Agreement

The proposed settlement provides that Defendants will fund a Public Information Campaign and a Rebate Program in exchange for a full release of all Class Members' claims.

The goal of the Public Information Campaign is to communicate the Fire Safety Message about the varying performance characteristics of smoke alarms employing ionization and/or photoelectric technology, as well as other information concerning fire safety, including, but not limited to, instructions on proper testing, installation, and

maintenance of smoke alarms.

Defendants will contribute at least $4.5 million to fund the Public Information Campaign to enhance fire safety in the home. This campaign will consist of three interrelated outreach programs: Media Outreach, Public Service Outreach, and Retailer Outreach.

As part of the Media Outreach, a third-party administrator will produce announcements highlighting the Fire Safety Message and place them in print, radio and television markets over the course of two years in a Court-approved plan. The administrator also will maintain an Internet website to disseminate the Fire Safety Message and Rebate Certificates. The plan is targeted to reach over 95% of the Class on average between thirteen to sixteen times.

As part of the Public Service Outreach, Defendants will produce Public Service Kits to be distributed to ranking fire officials in major metropolitan areas based on the mailing list maintained by the International Association of Fire Chiefs. Public Service Kits also will be distributed to the International Association of Fire Chiefs, the National Fire Protection Association, and the Congressional Fire Services Institute, for use by their memberships. The Public Service Kits will include instructional videotapes, sample public service announcement scripts, a press release, and a First Alert Double/Dual Sensor Smoke Alarm. Defendants will distribute at least 2,500 Public Service Kits.

As part of the Retailer Outreach, Defendants will produce Retailer Information

5

Kits to inform Class Members about the Fire Safety Message. Defendants, through their sales representatives, will provide Retailer Information Kits to their top retailers based on sales volume in the calendar year prior to implementation of the Retailer Outreach Program. These kits are designed for retailers to educate consumers about the Fire Safety Message and to motivate them to participate in the proposed five dollar mail-in rebate offer for First Alert Double/Dual Smoke Alarm. These kits will include written training materials and samples for retailers to use for circulars and in-store displays.

Defendants will also use their best efforts to persuade retailers, receiving Retailer Information Kits, to commit significant funds from the retailers' co-merchandising budgets to disseminate the Fire Safety Message to their customers. Defendants will fund the Retailer Outreach separately from the funds to be set aside for the Court-approved Public Information Campaign.

The Class is divided into Class One and Class Two, depending on the nature of the relief sought. Class One is an opt out class, under Fed. R. Civ. P. ("Rule") 23(b)(3). It consists of all purchasers, owners, and utilizers of ISDs and PSDs manufactured, supplied or marketed by Defendants, who seek monetary damages and/or equitable relief other than injunctive relief and/or declaratory relief. Membership in Class One excludes persons or entities with claims for money damages based on physical injury to a person, wrongful death, or damages to property other than the smoke detector itself. Class Two consists of purchasers, owners, and users of the said smoke detectors who seek injunctive relief and

6

declaratory relief.  Class Two is a mandatory class under Rule 23(b)(2).

Defendants will institute a Rebate Program in which each Class Member may claim a transferrable five dollar rebate, during a one year Rebate Period, on the purchase of a First Alert Double/Dual Sensor Smoke Alarm.  To qualify for the rebate, the Class Member only will be required to submit a completed Rebate Certificate and proof that he or she purchased a First Alert Double/Dual Sensor Smoke Alarm during the Rebate Period. Persons opting out of Class One, as defined below,  are not entitled to participate in the Rebate Program.  The rebate will be transferrable, so that a Class Member can allow someone else to claim his or her rebate if that consumer  follows the easy-to-understand instructions on the Rebate Certificate.  The Rebate Program will be funded by Defendants separately from the Public Information Campaign.  Defendants have agreed that rebates will not be paid from the Public Information Campaign fund and that this cost will not be passed on to consumers through a price increase.

In exchange for the relief described above, the Class Representatives, on behalf of the entire Class, have agreed to release each Class Member's claims or potential claims against Defendants and certain other Released Parties.

The proposed settlement provides for attorneys' fees of $1 million dollars and expenses of up to $150,000.  The precise amount of attorneys' fees and expenses is to be decided by the Court.

An incentive award of up to four DSDs will be provided to the named

7

Plaintiffs.

IV.  Opt-outs from and Objections to the Proposed Settlement

One Thousand Thirteen Class Members have elected to opt-out of the settlement.

The Court has also received communications from 72 individual *pro se* class members concerning the proposed settlement.  Three fourths of these (53) do not object to the settlement; rather, they request or impart additional information, or they express a desire to be included in the proposed settlement.  Thirteen of the Class Members  vehemently complain about the attorney's fees, to be awarded under the proposed settlement, and six of them feel strongly that the lawsuit is frivolous.

In addition to the *pro se* objections, counsel for plaintiffs in *Schmulback and Brown v. Pittway Corp., et al.*, (No. 98-L-33-A,Cir,Ct.of St. Clair County, Ill.) Filed an objection.  The *Schmulback* litigation was filed in an Illinois state court shortly after the filing of this case, a non-jury case based solely on Illinois law.  The substantive allegations of *Schmulback*  virtually are identical to the claims in this case, except that the Magnuson-Moss Act is not invoked.  The *Schmulback* court certified the matter as a class action by order dated October 11, 1999.  Although the court ordered that "appropriate notice [be] given to class members as soon as practicable," class counsel failed to notify  the Illinois-certified class as of the date on which the proposed settlement was presented to the *Schmulback* court.

Notably, the two named plaintiffs in the *Schmulback* case did not elect to opt-

8

out of this case and maintain their separate actions in the Illinois court.

Schmulback and Brown oppose the proposed settlement on the grounds that (1) notice of the proposed settlement was inadequate, principally because it failed to inform class members of the existence and implications of the *Schmulback* litigation; (2) the proposed rebate is illusory; (3) the product to which the rebate applies is not a solution for ISDs' inherent problems; and (4) the proposed settlement's "Educational Program" is only a marketing campaign by Defendants.

Cynthia S. Kelley of Pennsylvania appeared through counsel and objected on the basis that (1) the class members have conflicting interests; (2) the settlement relief is inadequate insofar as it does not include a subclass for Pennsylvania residents; and (3) the requirements for filing objections are unfair because "an objector is required to give individual grounds for objections and to give legal support thereof." (Objections to Class Settlement, p.2). Kelley's primary concern is that under the law of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 77 P.S. § 201-1 *et seq*., each prevailing class member would be entitled to a minimal recovery of $100.00.

Trevor Hughes, a Canadian, also objected to the proposed settlement. Although he is not a member of the class, his counsel was granted leave to participate in the case as an *amicus curiae*.  Hughes takes the position that (1) Plaintiffs can easily prove the liability of Defendants at trial; therefore, Plaintiffs should not have made concessions in the settlement negotiations; (2) for want of notice, class members were deprived of the

9

opportunity to learn about and possibly participate in the *Schmulback* litigation; (3) Defendants are "well able to withstand any judgment for compensation and for punitive damages;" and (4) the settlement is "patently unreasonable." (Court File Document 46, pp. 10, 11).

### IV.  Legal Standards

To approve the proposed settlement, the Court must conclude that it is fair, adequate, reasonable, and not the product of fraud or collusion.  Seven factors guide the Court's determination: (1) whether the proposed settlement is the product of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of the Plaintiffs' success on the merits; (5) the range of possible recovery; (6) the opinions of class counsel and the named Plaintiffs; and (7) the substance and amount of opposition to the proposed settlement.  *See Leverso v. Southtrust Bank of AL., Nat'l Ass'n*, 18 F.3d 1527, 1530 n.6 (11th Cir. 1994); *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir.1984).

### V.  Analysis

No evidence of fraud or collusion exists.  The settlement was negotiated at arm's length by highly experienced Class counsel.

Given the legal and factual complexity of the issues, the sheer number of plaintiffs, which is estimated in the tens of millions, and the scale of the litigation, continuing the litigation and conducting a trial would be incredibly complicated, tremendously

expensive, and extraordinarily lengthy. The Settlement, in comparison, will provide the Class with a real and substantial benefit. Defendants have committed at least $4.5 million to a three-prong Public Information Campaign designed to promote the Fire Safety Message and provide a $5 Rebate Certificate for the purchase of a smoke alarm that utilizes both ionization and photoelectric technology. The Public Information Campaign and the Rebate Program are designed to provide direct and certain relief, without the expense and substantial delay of further litigation.

The parties have engaged in extensive formal and informal discovery and related motion practice. Class counsel has reviewed tens of thousands of pages of documents produced by Defendants, consulted with numerous experts, reviewed trial transcripts and depositions of dozens of fact and expert witnesses, including Defendants' officers and employers from other cases involving Defendants, and conducted other formal and informal discovery.

Sufficient discovery has been undertaken in order to apprise the lawyers of the strengths, weaknesses, and risks involved in further litigation of this case. In addition to the discovery undertaken in this action, Defendants have made several motions to dismiss. These fully briefed motions extensively explored the substantive law applicable to Plaintiffs' claims and were ruled upon by the Court. The parties here have conducted sufficient discovery and motion practice to be able "to determine the probability of their success on the merits, the possible range of recovery, and the likely expense and duration of the litigation."

11

*Mashburn v. National Healthcare, Inc.*, 684 F. Supp. 660, 669 (M.D. Ala. 1988).

Absent settlement, the parties would continue to vigorously litigate the many hotly contested and novel issues of fact and law raised herein.

Defendants have denied and continue to deny each and every allegation brought by members of the Class and all charges of wrongdoing or liability of any kind. Defendants believe that they have strong factual and legal defenses to the claims of the Class, including, among others, that: (1) there has been no misrepresentation; (2) the Class Members have suffered no damage; (3) the smoke alarms do not breach any express or implied warranties; and (4) the claims are barred by the limitations and disclaimers in the products' warranties and by applicable statutes of limitation and repose.

In comparison to all of the uncertainties of continuing the litigation, the proposed Settlement will provide prompt and certain relief to all Class Members, who have, by definition, suffered no personal injury or property damage. The relief agreed to by the Defendants is precisely tailored to satisfy the relief requested in Plaintiffs' Second Amended Complaint.

The Settlement Agreement provides a comprehensive program that includes both injunctive and monetary relief designed to promote fire safety for Class Members. Defendants have promised to provide (1) a multimillion dollar three-prong Public Information Campaign to disseminate the Fire Safety Message to Class Members over a two-year period, and (2) a Rebate Program, which will allow Class Members to claim a five

dollar rebate on each First Alert Double/Dual Sensor Smoke Alarm purchased during the Rebate Period.

The experts agree that the Public Information Campaign and Rebate Program comport with sound fire safety and prevention principles and that they will provide a real benefit to Class Members and the public.

Class counsel and the Class Representatives favor the Settlement as fair and equitable to the Class. Abundantly sufficient notice was provided to the Class, which was given a full opportunity to object to any or all of the terms of the proposed Settlement. The result of this massive notification campaign to the Class, estimated in the tens of millions, is only 1,004 opt-outs from Class One and a mere 29 objections to the proposed settlement.

Both the absolute number and percentage of persons opting out of Class One is extremely low and clearly favors granting final approval to this Settlement. Only 1,004 people have opted out of Class One, which translates into a mere 0.00002% of Class Members. The number and percentage is very low in light of the extensive Notice Campaign, in which over 325,000 Long Form Notices were sent by first-class mail and repeated notices given in print and on television.

While Class Members have been given an opportunity to voice any objections they might have to the proposed settlement, ultimately, the Court must evaluate the adequacy of the Settlement in light of the benefits to the Class as a whole. The nature of class action litigation results in a settlement that may not satisfy every class member. *See In re "Agent*

13

*Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 761 (E.D. N.Y. 1984); *Salinas v. Roadway Express, Inc.*, 802 F.2d 787, 790 (5th Cir. 1986). As the Fifth Circuit has stated:

> While we appreciate and sympathize with the individual complaints and concerns expressed by the objectors, we remind the objectors and all other parties that a consent decree is a compromise that cannot possibly satisfy every class member's particular desires; rather, the decree must embody the best settlement available to the class as a whole. This record indicates that gains reached during the settlement could have been delayed, jeopardized or even lost entirely if litigation had continued. Thus, compromises here were fully justified so as not to gamble with the rights of everybody to satisfy the complaints of some.

*Salinas*, 802 F.2d at 790.

## VI. Objections to the Settlement

### A. The *Schmulback* Objection

Each of the *Schmulback* Objections is without merit.

The Court has the authority under the All Writs Act and the "necessary in aid of" exception to the Anti-Injunction Act to issue a preliminary injunction to prevent Class Members and their counsel from proceeding with litigation alleging substantially similar claims. The All Writs Act provides that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). In *In re Baldwin-United Corp.*, the Second Circuit noted that

14

> [a]n important feature of the All-Writs Act is its grant of
> authority to enjoin and bind non-parties to an action when
> needed to preserve the court's ability to reach or enforce its
> decision in a case over which it has proper jurisdiction.

770 F.2d 328, 338 (2d Cir. 1985) (citing *United States v. New York Tel. Co.*, 434 U.S. 159,

174 (1977).

The Court clearly has the power to enjoin the parties to parallel state suits.

"Thus, in the context of complex class action litigation, a federal district court may

appropriately use the All- Writs Act to remove and enjoin the prosecution of subsequent state

court claims in order to enforce its ongoing orders against relitigation and to guard the

integrity of its prior rulings over which it had expressly retained jurisdiction." *In re VMS*

*Sec. Litig.*, 103 F.3d 1317, 1324 (7th Cir. 1996). Under the Anti-Injunction Act, "[a] court

of the United States may not grant an injunction to stay proceedings in a State court *except*

as expressly authorized by Act of Congress, or *where necessary in aid of its jurisdiction*, or

to protect or effectuate its judgments." 28 U.S.C. § 2283 (emphasis added). In this case, the

preliminary injunction entered by this Court was necessary to protect the Court's authority

and implement the provisions of the settlement.

Contrary to the claims made in the *Schmulback* Objection and the *Hughes*

Objection, federal courts may enjoin state court litigation "once the litigation reaches the

settlement stage" to "effectuate a final settlement." *See, e.g., In re Mexico Money Transfer*

*Litig.*, No. 98 C 2407, 98 C 2408, 1999 WL 1011788, at *3 (N.D.Ill. Oct. 19, 1999). Thus,

15

numerous federal courts have recognized the power of federal courts to enjoin state court actions that would interfere with the implementation of a class action settlement. *See Flanagan v. Arnaiz*, 143 F.3d 540, 545-46 (9th Cir. 1998); *Battle v. Liberty Nat'l Life Ins. Co*., 877 F.2d, 877 , 882-83 (11th Cir. 1989); *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1332, 1334-35 (5th Cir. Unit A Oct. 1981), *cert. denied*, 456 U.S. 936 (1982); *Gross v. Barnett Banks, Inc.,* 934 F. Supp. 1340, 1345-46 (M.D.Fla. 1995); *see also In re Mexico Money Transfer Litig.*, 1999 WL 1011788, at *4 (noting that "class members could be burdened and confused by potentially receiving several class notifications.")

Schmulback-Brown's objection to the notice's failure to inform Class Members of the existence of the parallel Illinois state court litigation must be rejected. Rules 23(c) and (e) only require (1) notification of the *pending* action; (2) a general description of the terms of the proposed settlement; (3) notification of the right to opt-out of a class certified under Rule 23(b)(3) and that Class Members will be bound by the judgment unless they request exclusion; and (4) notification of the right of Class Members to appear and be heard on the fairness hearing.

Each of these requirements has clearly been satisfied in this case. The Class Representatives simply were not required to give notice of the Illinois state court action. Quite to the contrary, it is Schmulback and Brown, the plaintiffs in the Illinois action, who have apparently defaulted in their court-imposed duty to give notice to the class certified in that case. And for ought that appears, had notice of the pendency of the Illinois action been

16

included in the notice of the proposed settlement of this case, the class members in that action would have followed the lead of their class representatives Schmulback and Brown: they would not have excluded themselves from the proposed settlement in this case.

The Schmulback-Brown's perception of the Rebate Program as illusory is distorted. The perception is based on the erroneous assumption that Defendants are retailers, rather than manufacturers. When the financial data is properly analyzed, it is certain that the amount of the rebate greatly exceeds Defendants' gross profit margin on the DSDs.

The remaining Schmulback-Brown objections have no basis in fact.

### B.  The Hughes Objection

Trevor Hughes, as a Canadian citizen, has no standing in this case. He is not a member of either class, and the settlement does not in any way impair his ability to process his claims in the courts of Canada. Notwithstanding Hughes' lack of standing, the Court has considered his objections and finds them to be without merit.

### C.  The Kelley Objection

As noted earlier, the Kelley Objection is premised on a theory that if a Pennsylvania subclass were created, it could obtain additional monetary relief under Pennsylvania law. While subclassing may be appropriate if the action were to proceed to trial to accommodate variations in state laws, subclassing is inappropriate here because these classes are certified for settlement purposes only. The Named Plaintiffs and Class counsel adequately represent the entire Class; and they have not agreed to subclasses.

17

Objector Kelley could have opted out of Class One, but chose not to do so.

The Kelley Objection that the settlement allows for only one claim to be submitted per class member, is without factual basis.  Nowhere in the Stipulation of Settlement is there language which limits the rebate to one per Class Member.  In fact, the Settlement is designed to permit Class Members to "claim a five dollar ($5) rebate on each First Alert Double/Dual Sensor Smoke Alarm" purchased during the Rebate Period. (Stipulation of Settlement at § 9.1.)

### D.  The Remaining Objections

Several objections relate to attorneys' fees and expenses and the conduct or abilities of Class counsel.  Contrary to the views of the objectors, the parties have never agreed to a particular amount of attorneys' fees and expenses, but have, instead, agreed to allow the Court to determine the amount of the fees and expenses .  Class counsel have agreed that they will not request a fee in excess of $1 million dollars  or expenses in excess of $150,000.

The subject of Class counsel's fees was not negotiated between Defendants and Class counsel until after the terms of the Settlement Agreement were agreed to by the parties. Objector Sonya Meyers Davis' complaint that she has been "unable to purchase both ionization and photoelectric detectors, or, preferably, dual sensor models" and that the retailers she has visited do not "stock these models" will be cured by the terms of the settlement. The Retailer Outreach Program is designed to enlist the aid of product retailers

18

in informing Class Members about the Fire Safety Message so that retailers have an ample supply of First Alert Double/Dual Sensor Smoke Alarms.  In addition, Defendants will provide a Retailer Information Kit, comprised, in part of shelf displays for the First Alert Double/Dual Sensor Smoke Alarm and draft "ad slicks" to be used by retailers in connection with their programs.

### VII.  Attorneys' Fees and Expenses

Plaintiff Class is represented by three law firms: Crowley & Douglas, L.L.P., of Houston, Texas; Reich & Binstock of Houston; and Whatley Drake, L.L.C., of Birmingham, Alabama.  Each of these firms enjoys a well-deserved national reputation in handling class actions involving product liability and consumer torts.  As of September 11, 2000, these law firms had expended 2521.86 in aggregate attorneys hours in the preparation of this case.[1]

Thus, the attorneys for the Class are entitled to a lodestar of roughly $756,500. For the delay in payment and the exceptional results obtained, they are entitled to a multiplier of 1.3.  The monetary value of the Settlement conservatively exceeds $4.5 million dollars. Class counsel's requested attorneys' fee of $1 million dollars is therefore eminently reasonable.

---

[1] The Whatley Drake submissions do not reflect work performed after August 12, 2000. They have expended additional hours since that time, and even more will be required as the terms of the settlement are implemented.  The average hourly rate for the lawyers representing the Class is $300.00.

Class counsel have jointly incurred $111,466.13 in expenses (including $27,000 in paralegal expenses by Crowley & Douglas). They are entitled to reimbursement for these expenses, as well as future expenses as they are incurred up to the cap of $150,000.

In summary, the objections are due to be overruled.

### VII. Conclusion

The Court concludes that the proposed settlement is fair, reasonable, and adequate. It will be approved by separate order.

DONE this _____ 20th _____ day of November, 2000.

_____
UNITED STATES DISTRICT JUDGE
U. W. CLEMON